#28842-aff in pt & rev in pt-SRJ
**2020 S.D. 23**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

KAREN DUNHAM,                                Petitioner and Appellant,

    v.

LAKE COUNTY COMMISSION, LAKE
COUNTY COMMISSION SITTING AS
THE LAKE COUNTY BOARD OF
ADJUSTMENT,                                  Respondent and Appellee,

    and

HODNE HOMES, LLC,                            Respondent.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE KENT SHELTON
Judge

* * * *

JIMMY NASSER of
Nasser Law Firm, P.C.
Sioux Falls, South Dakota                    Attorneys for petitioner and
                                             appellant.


JACK H. HIEB
ZACHARY W. PETERSON of
Richardson, Wyly, Wise
   Sauck & Hieb, LLP
Aberdeen, South Dakota                       Attorneys for respondent and
                                             appellee.

* * * *

CONSIDERED ON BRIEFS
AUGUST 26, 2019
OPINION FILED **04/29/20**

#28842

JENSEN, Justice

[¶1.]      Hodne Homes, LLC purchased a lot in Lake County to build a facility to store and display boats.  After the purchase, Hodne Homes sought a variance and conditional-use permit (CUP) from the Lake County Board of Adjustment (Board), because the proposed facility exceeded the setback and size restrictions for the lot under the Lake County Zoning Ordinance (Ordinance).  The Board approved both requests over the objection of Karen Dunham, an adjoining landowner.  Dunham then petitioned the circuit court for a writ of certiorari challenging the Board's decision.  Hodne Homes was joined as an indispensable party to the certiorari proceedings.  Following a hearing, the court denied the writ of certiorari.  Dunham appeals the denial of the writ.  We affirm in part and reverse in part.

**Facts and Procedural History**

[¶2.]      In March 2018, Hodne Homes purchased Lot 1 of Dunham's and Hemmer's First Addition to Lake County (Lot 1).  Dunham has owned Lot 2 in Dunham's and Hemmer's First Addition (Lot 2) since 2002.  Lot 2 abuts the north side of Lot 1.  Sodak Marina, LLC owns the lot adjoining the south side of Lot 1 and operates a business selling boats on the lot.  Sodak Marina and Hodne Homes are both owned by Brandon and Jamie Hodne.

[¶3.]      Lots 1 and 2 are located in the area that the Ordinance classifies as Lake Park 3 zoning district of Lake County (LP-3).  Section 1105 of the Ordinance provided that LP-3 was "established to provide for oversized private and commercial storage facilities."  The uses permitted within LP-3 included "private and commercial storage facilities containing no more than four thousand (4,000) square

-1-

feet and [which] do not have side walls with a height greater than fourteen (14) feet." The Ordinance also imposed minimum setback requirements of two feet on the side yard and ten feet in the rear yard for properties within LP-3.

[¶4.]     Prior to purchasing Lot 1, Hodne Homes sought approval from adjoining landowners to construct an oversized facility on Lot 1 to display and store boats for Sodak Marina. The facility was proposed to be a 5,760-square-foot building with sixteen-foot side walls, exceeding the size and height restrictions permitted within LP-3. The proposed facility also exceeded the minimum setback requirements for Lot 1 by leaving only one foot on each side of the yard and five feet in the rear yard. The adjoining landowners, other than Dunham, consented to the proposed facility on Lot 1.[1]

[¶5.]     Immediately after purchasing Lot 1, Hodne Homes applied for a variance and a CUP for the oversized facility. The variance request sought to relax the two-foot side yard and ten-foot rear yard restrictions. The CUP application

---

1.     Lots 1 and 2 were also subject to a Declaration of Restrictive Covenants for Dunham's and Hemmer's First Addition dated November 27, 2000. The covenants provided that "no building or structure shall be erected, altered, placed or permitted to remain less than five (5) feet from the northerly, southerly, or easterly lot line." Dunham separately sued Hodne Homes for injunctive relief and damages alleging the building would violate the restrictive covenants. This action remains pending. Dunham argues that the Board should have applied the restrictive covenant when considering the zoning changes requested by Hodne Homes. However, Dunham did not present this issue to the Board, and the circuit court did not address the issue in the writ of certiorari proceedings. Because of our disposition and Dunham's failure to present the issue below, we decline to address the issue. *See Hall v. State ex rel. S.D. Dep't of Transp.*, 2006 S.D. 24, ¶ 12, 712 N.W.2d 22, 26; *Homestake Mining Co. v. S.D. Subsequent Injury Fund*, 2002 S.D. 46, ¶ 18, 644 N.W.2d 612, 616 ("We will not decide issues the circuit court has not had the opportunity to rule on.").

requested permission to exceed the height and square footage restrictions for the facility. Dunham objected, expressing that the facility would not comply with the Ordinance requirements for properties within LP-3, and that the facility was of nonconforming use because Hodne Homes intended to use the facility as a showroom. In response, Hodne Homes submitted a revised plan reducing the width of the facility to forty-seven feet. This change met the two-foot setback requirement on the side of Lot 1 adjoining Dunham's property but did not modify the setback distances on the south side and rear yard or the nonconforming size of the proposed facility. The Lake County Planning Board considered the revised plan at a public hearing on April 11, 2018, and recommended the approval of both the variance and the CUP.

[¶6.]     The Board considered Hodne Homes' applications for a variance and CUP at another public hearing on April 17, 2018. The Board was provided staff reports drafted by a Lake County zoning officer on both requests, which recommended approving the applications and provided a potential list of findings supporting approval of the requests prefaced with the phrase, "if the [Board] grants the [variance/conditional use] it could use the following findings." A section of each report also provided findings the Board could consider if it denied the requests.

[¶7.]     Dunham's son appeared before the Board in opposition. He expressed concerns with the size and use of the facility, as well as the lack of a drainage plan on Lot 1. The Board discussed the drainage issue and options available in the area. At the conclusion of the hearing, the Board approved Hodne Homes' requests,

adopted the "findings and specific conditions outlined in the staff report," and also required a drainage plan be developed for the facility.

[¶8.] On May 11, 2018, Dunham filed a petition for writ of certiorari with the circuit court alleging the Board's approval of the variance and the CUP were illegal and violated state statutes and the Ordinance. The circuit court granted Hodne Homes' motion for joinder in the certiorari proceedings. The court received written briefs and heard arguments but did not receive additional evidence. Applying a deferential standard of review, the circuit court denied Dunham's petition for writ of certiorari, determining the Board had jurisdiction to grant or deny the variance and CUP, and that both the variance and the CUP were granted in compliance with state statutes and the Ordinance.

[¶9.] Dunham now appeals the circuit court's order denying the writ. She raises several issues, which we state as follows:

> 1. Whether the Board exceeded its legal authority under the Ordinance when it approved the variance.
>
> 2. Whether the Board exceeded its legal authority under the Ordinance when it approved the CUP.
>
> 3. Whether Section 1105 of the Ordinance and the Board's CUP decision violated Dunham's due process rights.
>
> 4. Whether the Board committed other procedural errors in its consideration and approval of the variance and the CUP.

### Standard of Review

[¶10.] As an initial matter, the parties disagree as to the appropriate standard of review for both this Court and the circuit court in considering a challenge by writ of certiorari. The scope of judicial review in writ of certiorari

-4-

proceedings is statutorily determined by SDCL 21-31-8.[2] We have interpreted this statute to limit certiorari review "to whether the board of adjustment had jurisdiction over the matter and whether it pursued in a regular manner the authority conferred upon it." *Wedel v. Beadle Cty. Comm'n*, 2016 S.D. 59, ¶ 11, 884 N.W.2d 755, 758 (quoting *Hines v. Bd. of Adjustment of Miller*, 2004 S.D. 13, ¶ 10, 675 N.W.2d 231, 234). We will sustain the lower tribunal's decision "unless it did some act forbidden by law or neglected to do some act required by law." *Id.* (quoting *Armstrong v. Turner Cty. Bd. of Adjustment*, 2009 S.D. 81, ¶ 12, 772 N.W.2d 643, 648).

[¶11.] Dunham argues, however, that de novo review of a lower tribunal's decision is appropriate when a board or commission has "acted fraudulently or in arbitrary or willful disregard of undisputed and indisputable proof." *Lamar Outdoor Advert. of S.D., Inc. v. City of Rapid City*, 2007 S.D. 35, ¶ 21, 731 N.W.2d 199, 205 (quoting *Cole v. Bd. of Adjustment of Huron* (*Cole I*), 1999 S.D. 54, ¶ 10, 592 N.W.2d 175, 177). Dunham submits that the Board's actions were done in willful disregard of the facts in this case and were contrary to the provisions of the Ordinance. As a threshold matter, Dunham failed to present evidence to the circuit court that the Board committed fraud, acted arbitrarily, or willfully disregarded undisputed facts or proof in its consideration of the variance and the CUP. Given

2. SDCL 21-31-8 provides:

> The review upon writ of certiorari cannot be extended further than to determine whether the inferior court, tribunal, board, or officer, has regularly pursued the authority of such court, tribunal, board, or officer.

the lack of any such evidence, a deferential review of these certiorari proceedings is appropriate. Further, Dunham's arguments would logically expand the scope of review in every certiorari proceeding to consider whether a board of adjustment's findings were correct. "The interpretation of an ordinance presents a question of law which we review de novo." *Cole I*, 1999 S.D. 54, ¶ 4, 592 N.W.2d at 176. However, "[c]ertiorari cannot be used to examine evidence for the purpose of determining the correctness of a finding." *Hines*, 2004 S.D. 13, ¶ 10, 675 N.W.2d at 234.

[¶12.]     Dunham also argues that a deferential standard of review only holds if there is not a "special and express statutory provision" establishing a contrary standard. *See State ex rel. Grey v. Circuit Court of Minnehaha Cty.*, 58 S.D. 152, 235 N.W. 509, 511 (1931). To this end, Dunham argues SDCL 11-2-64[3] and SDCL 11-2-65[4] permit de novo review of the merits.

[¶13.]     These statutes do not direct de novo review of a decision granting or denying a variance or a CUP. We have recognized that petitions challenging a decision by a board of adjustment under SDCL 11-2-61 "are postured as writs of

---

3.     SDCL 11-2-64 provides:

> If upon the hearing it appears to the court that testimony is necessary for the proper disposition of the matter, the court may take evidence, or appoint a referee to take such evidence as it may direct and report the evidence to the court with the referee's findings of fact and conclusions of law, which constitute a part of the proceedings upon which the determination of the court is made.

4.     SDCL 11-2-65 provides in part:

> The court may reverse or affirm, wholly or partly, or may modify the decision brought up for review.

certiorari; thus judicial review is limited." *Wedel*, 2016 S.D. 59, ¶ 11, 884 N.W.2d at

758. While SDCL 11-2-64 permits a court to receive evidence when "it appears to

the court that testimony is necessary," the statute does not modify the scope of

judicial review. Likewise, SDCL 11-2-65 addresses the authority of the courts to

grant relief on a petition under SDCL 11-2-61, but this section does not pertain to

the scope of review. Our prior decisions have consistently maintained this limited

scope of review in certiorari proceedings, and Dunham's arguments do not support

expanding our review in this case.

### Analysis & Decision

> *1.*      *Whether the Board exceeded its legal authority under the Ordinance when it approved the variance.*

[¶14.]      Dunham initially claims that the Board was not authorized to grant

the variance sought by Hodne Homes to relax the setback requirements. Dunham

points to the language in Article II of the Ordinance, defining a variance as

> a relaxation of the terms of the zoning ordinance where such variance will not be contrary to the public interest *and where, owing to conditions peculiar to the property and not the result of the actions of the applicant, a literal enforcement of the ordinance would result in unnecessary and undue hardship* . . . .

(Emphasis added.) Dunham argues that Hodne Homes failed to make any

showing that the variance was necessary because of the peculiar conditions of

the property or undue hardship on the owners. She claims that the variance

was only requested because of Hodne Homes' decision to construct an

oversized facility on Lot 1.

[¶15.]      Dunham claims the Board exceeded its authority under the Ordinance

because there were no unique, exceptional, or extraordinary features on Lot 1

providing a basis to grant a variance. Dunham relies on Section 505 of the

Ordinance, which provides the Board with the power and jurisdiction to grant a

variance as follows:

> The Board of Adjustment *shall have the power, where, by reason of exception, narrowness, shallowness or shape of a specific piece of property at the time of the enactment of this Ordinance, or by reason of exceptional topographic conditions or other extraordinary and exceptional situation or condition of such piece of property,* the strict application of any regulation under this Ordinance would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardships upon, the owner of such property, to authorize, upon an appeal relating to the property, a variance from such strict application so as to relieve such difficulties or hardship, if such relief may be granted without substantially impairing the intent and purpose of this Ordinance.

(Emphasis added.)

[¶16.]    The staff report, adopted as part of the findings by the Board, stated:

> The variance would not be injurious to the neighborhood or detrimental to the public welfare . . . . Granting the variance would not substantially impair the intent and purpose of the zoning ordinance . . . . There are special conditions or circumstances that exist which are peculiar to the land, structure, or building involved, and which are applicable to other land, structures or buildings in the same district.

Dunham argues these findings by the Board are mere boilerplate language and fail

to provide any basis for the Board to grant a variance under the Ordinance.

[¶17.]    The language of the Ordinance for variances is consistent with SDCL

11-2-53(2), which permits a board of adjustment to:

> Authorize upon appeal in specific cases such variance from terms of the ordinance as will not be contrary to the public interest, if, owing to special conditions, a literal enforcement of the provisions of the ordinance will result in unnecessary

hardship and so that the spirit of the ordinance is observed and substantial justice done . . . .[5]

[¶18.]     In *Hines*, this Court held that SDCL 11-2-53(2) creates a two-part test for granting a variance.  "[F]or a [board of adjustment] to grant a variance, both the public interest prong and special conditions prong must be met."  2004 S.D. 13, ¶ 12, 675 N.W.2d at 234.  *Hines* determined the board of adjustment improperly denied the variance under the first prong by only considering the objections of neighboring landowners rather than the proper test of whether the variance was "contrary to the public interest."  *Id.* ¶ 16.  In reversing the board's denial of the variance, the Court stated that the board's "failure to follow the test mandates the conclusion that the board exceeded the scope of authority granted" by the zoning ordinance.  *Id.* ¶ 13.

[¶19.]     Here, the Board found that the variance "would not be injurious to the neighborhood or detrimental to the public welfare."  This finding satisfies the first prong required for a variance under the Ordinance and SDCL 11-2-53.  While Dunham challenges this finding by the Board, "[c]ertiorari cannot be used to examine evidence for the purpose of determining the correctness of a finding."  *Hines*, 2004 S.D. 13, ¶ 10, 675 N.W.2d at 234 (quoting *Cole I,* 1999 S.D. 54, ¶ 11, 592 N.W.2d at 177).

[¶20.]     However, the Board failed to consider the second prong requiring the existence of special conditions to grant a variance.  The Board made a terse finding that special conditions exist on the property but failed to meaningfully address the special conditions required by Section 505 for the Board to have authority to grant a

---

5.     The 2020 Legislature made non-substantive changes effective July 1, 2020.

variance. More specifically, the Board made no determination that because of a particular feature of the property at the time the Ordinance was enacted, or because of some "extraordinary and exceptional" situation on the property, a variance was necessary. The Board also failed to consider whether the denial of the variance to build a facility exceeding the setback requirements would create "peculiar and exceptional practical difficulties" or an "exceptional and undue hardship" on Hodne Homes. The Board exceeded its authority by failing "to follow the prescribed test" within the Ordinance. *Hines,* 2004 S.D. 13, ¶ 13, 657 N.W.2d at 234.

[¶21.] For this reason, we reverse the circuit court's denial of certiorari relief to Dunham on the Board's decision granting a variance to Hodne Homes. However, we address Dunham's other separate challenges to the variance to provide the Board and parties with guidance on remand.

[¶22.] Dunham also maintains that by approving the variance, the Board authorized Hodne Homes to expand the business of Sodak Marina to begin selling boats on Lot 1, a use which is not permitted within the LP-3 district. Dunham argues that the Board exceeded its authority to grant a variance under Section 505 by permitting this nonconforming use on Lot 1. She cites to Section 505(3), which provides that "[u]nder no circumstances shall the Board of Adjustment grant a variance to allow a use not permissible under the terms of this Ordinance in the district involved, or any use expressly or by implication prohibited by the terms of this Ordinance in said district."

[¶23.] Hodne Homes' application for a variance stated that it intended to use the facility to store and display boats that would be sold at Sodak Marina, adjacent to Lot 1. Dunham claimed this use would exceed approved uses in LP-3 for "oversized private and commercial storage facilities." In granting the variance, however, the Board made no determination whether the proposed facility to store and display boats for Sodak Marina was within the approved uses for "oversized private and commercial storage facilities" within LP-3. In order to comply with Section 505(3) on remand, the Board must determine whether the variance will allow a use that is not permissible within LP-3.

[¶24.] Dunham also argues the variance for the rear and side yard setbacks within LP-3 was impermissible under Section 305 of Article III of the Ordinance.[6] She argues that the language "except hereinafter provided" in Section 305 means the Board could not reduce the setback requirements without specific authorization to do so. The Board responds that Section 305 sets a baseline for owners to follow and that the variance was appropriate for a relaxation of the requirements. The Board also argues Dunham's interpretation of the phrase "except as hereafter provided" is incorrect and the phrase actually means the size restrictions in Section

---

6. The applicable portion of Section 305 provides:

> [e]xcept as hereafter provided:
> . . . .
> 4. The minimum yards and other open spaces, including lot area per family, required by this Ordinance for each and every building at the time of passage of this Ordinance or for any building hereafter erected shall not be encroached upon or considered as yard or open space requirements for any other buildings, nor shall any lot area be reduced beyond the district requirements of this Ordinance.

305 should be followed unless grounds exist to allow a deviation from these requirements.

[¶25.] We agree with the Board. A plain reading of Section 305 indicates that the lot restrictions must be adhered to within each district except as otherwise provided within the Ordinance. A variance under Section 505 is one such provision that authorizes the Board to relax the lot setback requirements. The Board's discretion to grant a variance under the Ordinance is broad. *Cole v. Bd. of Adjustment of Huron* (*Cole II*), 2000 S.D. 119, ¶ 17, 616 N.W.2d 483, 488. Dunham's interpretation of Section 305 would impose a restriction on the Board's ability to grant a variance that is not supported by the language of the Ordinance.

> **2.      *Whether the Board exceeded its legal authority under the Ordinance when it approved the CUP.***

[¶26.] Dunham also challenges the Board's decision to grant Hodne Homes' application for a CUP allowing the construction of an oversized facility on Lot 1. Dunham initially argues the Board lacked the authority under the Ordinance to grant a CUP to increase the size of a proposed facility within LP-3. She cites to the prohibited uses set forth in Section 306 of the Ordinance, which provides that "[a]ll uses and structures not specifically listed as a permitted use or as a conditional use in a particular zoning district or overlay district shall be prohibited in said district." Dunham further argues that increasing the permitted *size* of a structure, as opposed to expanding or modifying the allowed *use* of such a structure is not encompassed within the statutory definition of a conditional use in SDCL 11-2-

17.4.[7]  The Board responds that there is no language in the statute that prohibits the granting of a CUP to increase the size restriction on a building within a zoning district.  The Board also cites to Section 1105 and argues that the Ordinance provides the Board broad discretion to permit other uses within LP-3.

[¶27.]        The permitted uses of structures located in LP-3 are defined in Section 1105 of the Ordinance not only by the type of activity allowed therein (private and commercial storage facilities), but also by the *size* of such structures.  Section 1105 allows the Board to permit conditional uses so long as the Board determines that they "are not detrimental to other uses and are in the general character of the other uses in LP-3" and otherwise comply with the Ordinance provisions.  There is nothing in either Section 1105 or SDCL 11-2-17.4 that prohibits the Board from granting a CUP to modify the size restrictions for permitted uses within LP-3.[8] Dunham has therefore failed to establish that the Board was without authority to grant a CUP to permit the construction of an oversized storage facility in LP-3.

---

7.    SDCL 11-2-17.4 provides:

> A conditional use is any use that, owing to certain special characteristics attendant to its operation, may be permitted in a zoning district subject to the evaluation and approval by the approving authority specified in § 11-2-17.3. A conditional use is subject to requirements that are different from the requirements imposed for any use permitted by right in the zoning district.

8.    Dunham also argues that SDCL 11-2-13 prohibits the Board from using a CUP to modify the size restriction for the construction of a building, but Dunham's reliance on SDCL 11-2-13 is ill-founded.  This statute authorizes the Board to establish regulations concerning both size and use of structures, and there is no language in SDCL 11-2-13 limiting the Board's ability to grant a CUP application relating to either size or use restrictions.

[¶28.]     Dunham also challenges the adequacy of the findings to grant the CUP application. In granting the CUP, the Board determined the oversized facility would not be detrimental to other uses and would be in the general character of uses in LP-3. The Board also made findings pursuant to Section 504, which requires the Board, before granting a CUP, to find the "granting of the conditional use will not adversely affect the public interest . . . ." Contrary to Dunham's claim, the Board also considered other criteria under Section 504, such as: access to the property, public safety, parking, utilities, noise and lighting from the use, the appearance of the property, and the "[g]eneral compatibility with adjacent properties and other property in the district."

[¶29.]     The Board ultimately determined that the oversized storage facility would not adversely affect the public interest and was "compatible with other properties in [LP-3]." Specifically, this included a finding that there were other "oversized storage buildings in the area that are similar and on similar sized lots." The Board also found that other considerations within Section 504 had been satisfied. The Board's decision to grant the CUP allowing a larger facility on Lot 1 was within its discretion to modify or relax zoning requirements under the Ordinance. *See Cole II*, 2000 S.D. 119, ¶ 17, 616 N.W.2d at 488. We are limited to considering "whether it pursued in a regular manner the authority conferred upon it," not "whether the Board's decision was right or wrong." *Wedel*, 2016 S.D. 59, ¶ 11, 884 N.W.2d at 758 (citation omitted).

[¶30.]     Therefore, Dunham failed to establish that the Board exceeded its authority by granting the CUP for the construction of an oversized storage facility

on Lot 1. *See Hines*, 2004 S.D. 13, ¶ 13, 675 N.W.2d at 234. Under our deferential review, the Board had "jurisdiction over the matter and . . . it pursued in a regular manner the authority conferred upon it." *Wedel*, 2016 S.D. 59, ¶ 11, 884 N.W.2d at 758 (quoting *Hines*, 2004 S.D. 13, ¶ 10, 675 N.W.2d at 234). We affirm the circuit court's denial of certiorari relief to Dunham on the Board's CUP decision.[9]

### 3. Whether Section 1105 of the Ordinance and the Board's CUP decision violated Dunham's due process rights.

[¶31.] Dunham next argues that Section 1105 allowing for a CUP that is "not detrimental to other uses and [is] in the general character of the other uses in the LP-3 district" creates ambiguity and leaves the determination to the arbitrary opinion of the Board in each instance. She claims the lack of any criteria to consider a CUP within this section violated her due process rights. To succeed on her claim, she must overcome the presumption that county ordinances are valid by showing that the ordinance is "arbitrary, capricious, and unconstitutional." *In re Conditional Use Permit No. 13-08*, 2014 S.D. 75, ¶ 13, 855 N.W.2d 836, 840 (quoting *City of Brookings v. Winker*, 1996 S.D. 129, ¶ 4, 554 N.W.2d 827, 829).

[¶32.] As discussed above, Section 504 of the Ordinance outlines a detailed list of specific criteria the Board must consider before granting a CUP, in addition to the considerations in Section 1105. The Board made findings on the considerations in Section 504 before granting the CUP. Dunham has failed to show

---

9. The Board specifically conditioned the approval of the CUP "upon compliance with all applicable provisions of the [Ordinance]". We express no opinion whether our reversal and remand of the variance decision impacts the conditional use approved by the Board.

that the criteria for granting a CUP under the Ordinance was vague, or otherwise arbitrary, capricious, or unconstitutional.

        4. ***Whether the Board committed other procedural errors in its consideration and approval of the variance and the CUP.***

[¶33.]      Dunham argues the Board's approval of the variance and the CUP applications violated the procedural requirements of the Ordinance. Specifically, Dunham claims the Board failed to make proper findings and identify the members of the Board approving the variance and the CUP applications. She further alleges that the Board improperly relied upon staff recommendations rather than exercising its own discretion and its staff had improper ex parte contact with Hodne Homes prior to the hearing.

[¶34.]      In challenging the Board's findings, Dunham points Section 501 of the Ordinance, which requires the Board maintain minutes of its proceedings and examinations. However, the language of the Ordinance does not require the Board to make a verbatim record of its proceedings. While the record maintained by the Board is minimal, we are not convinced the Board failed to comply with the Ordinance.

[¶35.]      Dunham also claims the Board failed to properly exercise its discretion by adopting wholly the recommended findings by Board staff. She cites *Hines*, 2004 S.D. 13, ¶ 16, 675 N.W.2d at 236, in support of her claim that this was an improper delegation of the Board's decision making authority. However, *Hines* did not address or limit the ability of a board of adjustment to rely on the expertise and investigation of staff when making a zoning decision. Dunham fails to cite any other authority to support her claim that the Board could not adopt the

recommended findings of its staff in its decision. Moreover, Dunham has failed to present evidence that any individual member of the Board failed to exercise his or her own discretion in voting to approve the variance and the CUP.

[¶36.] Dunham also argues that the recommendations by Board staff were tainted by ex parte discussions with representatives from Hodne Homes prior to the hearing. However, Dunham has failed to identify any specific communications or show how they affected the neutrality of the Board. "Decision makers 'are presumed to be objective and capable of judging controversies fairly on the basis of their own circumstances.'" *In re Drainage Permit 11-81*, 2019 S.D. 3, ¶ 38, 922 N.W.2d 263, 274.

[¶37.] Finally, Dunham argues that the Board failed to record each individual member's vote on the variance and the CUP as required by the Ordinance. Dunham does not claim the votes were insufficient to approve the variance and the CUP or that any procedural irregularities prejudiced her. "[C]ertiorari will not lie to review technical lack of compliance with law or be granted to correct insubstantial errors which are not shown to have resulted in prejudice or to have caused substantial injustice." *Adolph v. Grant Cty. Bd. of Adjustment*, 2017 S.D. 5, ¶ 7, 891 N.W.2d 377, 381 (quoting *State ex rel. Johnson v. Pub. Utils. Comm'n of S.D.*, 381 N.W.2d 226, 230 (S.D. 1986).

## Conclusion

[¶38.] We reverse the circuit court's decision denying certiorari relief on the Board's decision granting the variance because the Board exceeded its authority in granting the variance. We remand the variance application to the Board for further

proceedings consistent with this opinion.  We affirm the circuit court's denial of the writ of certiorari as to the Board's CUP decision as well as the other claims of error asserted by Dunham in the proceedings before the Board.

[¶39.]       GILBERTSON, Chief Justice, and KERN, SALTER, DEVANEY, Justices, concur.