#30084-a-SRJ
**2023 S.D. 38**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

DAKOTA CONSTRUCTORS, INC.,                  Petitioner and Appellant,

v.

HANSON COUNTY
BOARD OF ADJUSTMENT,                        Respondent and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
HANSON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHRIS S. GILES
Judge

* * * *

PAUL H. LINDE of
Schaffer Law Office, Prof. LLC
Sioux Falls, South Dakota                   Attorneys for petitioner
                                            and appellant.


JACK H. HIEB
ZACHARY W. PETERSON of
Richardson, Wyly, Wise
    Sauck & Hieb, LLP
Aberdeen, South Dakota                      Attorneys for respondent
                                            and appellee.

* * * *

ARGUED
APRIL 27, 2023
OPINION FILED **07/26/23**

#30084

JENSEN, Chief Justice

[¶1.]	In 2021, Dakota Constructors, Inc. (Dakota Constructors) purchased a quarry located in Hanson County that had operated since 1986 under a state license to mine sand, gravel, and rock.  The Hanson County Zoning Ordinance (Ordinance) took effect in April 2000.  After the purchase, the Hanson County Zoning Administrator advised Dakota Constructors that because the quarry is located in a district that is currently zoned as agricultural, it would need a conditional use permit (CUP) under the Ordinance in order to extract sand, gravel, and rock from the site.  Dakota Constructors submitted a CUP application but argued before the Hanson County Board of Adjustment (Board) that it did not need a CUP because the operation of the quarry was a continuing prior nonconforming use.  The Board disagreed and determined that Dakota Constructors did need a CUP because the nonconforming use contemplated—the extraction of materials from the site—had ceased for more than one year.  The Board granted the CUP application with specified conditions.  Dakota Constructors petitioned for a writ of certiorari.  Following a hearing, the circuit court denied the writ.  Dakota Constructors appeals.  We affirm.

## Background

[¶2.]	Fisher Sand & Gravel Co. (Fisher) initially operated a quarry at the property.[1]  From and after 1986, Fisher annually renewed its mining license with

---

1.	Except for 2004 and 2005 when the quarry was operated by Spencer Quarries, Fisher continuously leased the property from the Metz family.  Over the years, Fisher and the Metz family were in discussions on reclamation plans for the property, and the Metz family commenced a federal

(continued . . .)

-1-

the South Dakota Department of Environmental and Natural Resources (now the Department of Agriculture and Natural Resources) Mineral and Mining Program, pursuant to SDCL chapter 45-6. The renewal process included filing annual reports and giving public notices of its intent to continue the operation at the site. Fisher filed an annual mine report with the Department on January 25, 2021, along with notice of intent to continue the quarry operation through 2031. After Dakota Constructors purchased the operation, the Department approved the transfer of reclamation liabilities from Fisher to Dakota Constructors for the Hanson County site.

[¶3.] At the direction of the County Zoning Administrator, Dakota Constructors submitted a CUP application to Hanson County on November 15, 2021. A Board hearing on the application was initially set for December 22, 2021, but was deferred to January 26, 2022. During this time, the Board received a report from an engineering firm providing recommendations for stabilizing a portion of the quarry that was impacting the integrity of a nearby County road. The report discussed needed repairs in an area where a fence had been constructed ten feet from the highwall of the quarry and twenty feet from the guardrail. A slump undermining the fence had come within fifteen feet of the guardrail, and the ground was eroded up to the fence in four other locations. The estimated cost of the repairs was $620,500.

---

(. . . continued)
   lawsuit involving the reclamation issues. Fisher eventually purchased the
   property from the Metz family before the sale to Dakota Constructors.

[¶4.]     At the hearing, Dakota Constructors argued to the Board that a CUP was not required because the operation of the quarry was a continuing prior nonconforming use. The Board received voluminous documents and statements concerning the operation at the quarry dating back to 1986. These submissions showed the quarry operated as a state-licensed mining operation since 1986 and that aggregate in the form of sand, gravel, and rock had been continuously removed from the quarry since that time. Dakota Constructors presented an affidavit from Clinton Degen, former Hanson County Highway Superintendent, who stated that he hauled material from the property each year except for 2004 and 2005 when Spencer Quarries was operating and hauling aggregate from the site.

[¶5.]     However, the submissions also showed that since 2004 the sand, gravel, and rock removed from the quarry had come from stockpiles stored at the site that had been extracted from the ground prior to 2004. In particular, the annual mine reports required by SDCL 45-6-72 showed that zero tons of aggregate were mined from the quarry from 2004–2021. Michael G. Erickson, a scientist from the Department, explained in a February 2022 email exchange with the Zoning Administrator that "[m]ining is not defined in statute under [SDCL chapter 45-6 (addressing sand, gravel and construction aggregate mining)]. We have always gone with the extraction of sand, gravel, or rock from the ground as mining. Thus the removal of stockpiled material is not considered mining."[2]

---

2.     Erickson had indicated in a 2003 correspondence, included in the file, that tonnage calculations are based on when materials are "mined (extracted) from the ground." The correspondence explained that hauling material from stockpiles on the site would not figure into the tonnage calculation because

(continued . . .)

[¶6.] The Board held hearings on three dates to consider the CUP application. On February 23, the Board made findings determining that the previous operation of the quarry had ceased for more than one year and was thus not a prior nonconforming use that could continue without a CUP. After determining a CUP was necessary for Dakota Constructors to operate the quarry, the Board approved the CUP and established conditions for use of the quarry, including repair of the erosion near the road, before commencing blasting. The Board's findings included:

1. [Dakota Constructors] presented a legal statement to the Board. Statement is on file with the Hanson County Zoning Office.
2. The requested conditional use is permitted under Article 5, Section 507 of Hanson County Zoning Ordinance.
3. The request does require a Conditional Use permit. The current owner will be expanding to occupy a greater area of land. Article 3, Section 1305, Hanson County Zoning Ordinance.[3]
4. The previous operation has ceased for more than one year according to all records filed with the State of South Dakota. Article 3, Section 1305, Hanson County Zoning Ordinance.

[¶7.] Dakota Constructors filed a petition for writ of certiorari with the circuit court. The court held a hearing on the petition and issued a memorandum decision and a corresponding order denying the writ. The court concluded that the

_____

(. . . continued)
that same material already would have been accounted for at the time it was mined.

3. In the Board's brief, it concedes it had "essentially abandoned its position on expansion in its [arguments to the circuit court], acknowledging that the record did not address expansion of the operations. Consequently, the Board's argument in this appeal is limited to the cessation of the non-conforming use for more than one year."

Board's interpretation of the Ordinance must be given deference under SDCL 11-2-61.1 and that the Board had exclusive authority to determine whether the prior nonconforming land use had ceased for over a year. The court also found that Dakota Constructors "did not meet its burden in showing the Board acted fraudulently or in an arbitrary or willful disregard of undisputed and indisputable proof in its determination that Dakota Constructors needed a [CUP] . . . ."

[¶8.] Dakota Constructors appeals and raises a single issue, which we restate as follows:

> Whether the circuit court erred in denying the writ of certiorari challenging the Board's decision to require Dakota Constructors to obtain a conditional use permit to extract gravel, sand, or minerals from its quarry.

### Analysis

[¶9.] Decisions granting or denying CUPs are reviewed under the writ of certiorari standard. SDCL 11-2-61.1. The statute provides as follows:

> Any appeal of a decision of granting or denying a conditional use permit shall be brought under a petition, duly verified, for a writ of certiorari directed to the approving authority and, notwithstanding any provision of law to the contrary, shall be determined under a writ of certiorari standard regardless of the form of the approving authority. The court shall give deference to the decision of the approving authority in interpreting the authority's ordinances.

*Id.*

[¶10.] "The review upon writ of certiorari cannot be extended further than to determine whether the inferior court, tribunal, board, or officer, has regularly pursued the authority of such court, tribunal, board, or officer." SDCL 21-31-8. "[T]he statute 'limit[s] certiorari review "to whether the board of adjustment had

jurisdiction over the matter and whether it pursued in a regular manner the authority conferred upon it.""" *Powers v. Turner Cnty. Bd. of Adjustment*, 2022 S.D. 77, ¶ 27, 983 N.W.2d 594, 604 (alterations in original) (quoting *Ehlebracht v. Deuel Cnty. Plan. Comm'n*, 2022 S.D. 18, ¶ 12, 972 N.W.2d 464, 470). "The test of jurisdiction is whether there was power to enter upon the inquiry[.]" *Id.* (alteration in original) (quoting *Ehlebracht*, 2022 S.D. 18, ¶ 12, 972 N.W.2d at 470). "With a writ of certiorari, we do not review whether the [board's] decision is right or wrong." *Id.* (alteration in original) (quoting *Ehlebracht*, 2022 S.D. 18, ¶ 13, 972 N.W.2d at 470). "Courts must not review the merits of a petition or evidence for the purpose of determining the correctness of a finding, in the absence of a showing that the Board 'acted fraudulently or in arbitrary or willful disregard of undisputed and indisputable proof.'" *Id.* (quoting *Ehlebracht*, 2022 S.D. 18, ¶ 13, 972 N.W.2d at 470). "[W]e will sustain the lower tribunal's decision 'unless it did some act forbidden by law or neglected to do some act required by law.'" *Id.* (alteration in original) (quoting *Ehlebracht*, 2022 S.D. 18, ¶ 13, 972 N.W.2d at 470).

[¶11.] We have not directly addressed the deference mandated by SDCL 11-2-61.1 for this Court's review of a board of adjustment's interpretation of a county zoning ordinance. Enacted in 2018, SDCL 11-2-61.1 provides in relevant part that "[t]he court shall give deference to the decision of the approving authority in interpreting the authority's ordinances." Yet, even before this statutory language became effective, we employed a judicially created deference: "[i]n passing on the meaning of a zoning ordinance, the courts will consider and give weight to the construction of the ordinance by those administering the ordinance. However, 'an

administrative construction is not binding on the court, which is free to overrule the construction if it is deemed to be wrong or erroneous.'" *Croell Redi-Mix, Inc. v. Pennington Cnty. Bd. of Comm'rs*, 2017 S.D. 87, ¶ 20, 905 N.W.2d 344, 350 (quoting *Wegner Auto Co. v. Ballard*, 353 N.W.2d 57, 58 (S.D. 1984)). We conclude that the deference this Court employed in *Croell Redi-Mix, Inc.* is consistent with the language of SDCL 11-2-61.1, and we employ this standard in considering the petition for writ of certiorari before us.

[¶12.] The deference mandated by SDCL 11-2-61.1 does not apply to a wrong or erroneous construction. For instance, in *Croell Redi-Mix, Inc.*, we determined the language of the zoning ordinance was unambiguous and expressly prohibited the board from issuing the requested permit for the purpose intended. *Id.* ¶ 18, 905 N.W.2d at 349. Thus, we held that "[w]hen the meaning of an ordinance is unambiguous, the contrary interpretation of those administering the ordinance is not entitled to deference." *Id.* ¶ 20, 905 N.W.2d at 350; *see also Dunham v. Lake Cnty. Comm'n*, 2020 S.D. 23, ¶¶ 20–21, 943 N.W.2d 330, 335–36 (reversing denial of certiorari relief based on the board's failure to follow a clear ordinance requirement). Nor does our deference extend to application of state law or constitutional interpretation. *See State v. Powers*, 2008 S.D. 119, ¶ 7, 758 N.W.2d 918, 920. "Statutory interpretation and application are questions of law, and are reviewed by this Court under the de novo standard of review." *Id.* (quoting *Rotenberger v. Burghduff*, 2007 S.D. 7, ¶ 8, 727 N.W.2d 291, 294). Similarly, this Court reviews de novo issues of constitutional interpretation. *Holborn v. Deuel Cnty. Bd. of Adjustment*, 2021 S.D. 6, ¶ 22, 955 N.W.2d 363, 374.

[¶13.] Dakota Constructors contends that no deference should be afforded to the Board because its reading of the Ordinance implicates South Dakota law incorporated into the Ordinance. Dakota Constructors argues that the circuit court, contrary to SDCL 11-2-26, "improperly allowed the Board unfettered authority to regulate a preexisting and continuing nonconforming use."

[¶14.] Article 5, section 507, of the Ordinance identifies conditional uses that may be permitted within an agricultural district. One such use is the "[e]xtraction of sand, gravel, or minerals provided such uses meet requirements for conducting surface mining activities of SDCL [chapter] 45-6B." Dakota Constructors argues that the Ordinance "necessarily incorporates the statutory definition of surface mining in SDCL 45-6B-3(15)" and that the Board read the term "extraction" contrary to this statute.[4] Dakota Constructors relies heavily on its predecessor's compliance with state mining license requirements and the fact that Fisher was never required to obtain a CUP to operate the quarry. Its argument is essentially that the nonconforming use of the property is being a "quarry," and because the

---

4. SDCL 45-6B-3(15) defines "surface mining" as "the mining of minerals by removing the overburden lying above such deposits and mining directly from the deposits thereby exposed. The term includes mining directly from such deposits where there is no overburden and such practices as open cut mining, open pit mining, strip mining, placer mining, quarrying, and dredging[.]" SDCL 45-6B-3(13) defines "overburden" as "all of the earth and other materials which are disturbed or removed, in the original state, or as it exists after removal from its natural state in the process of surface mining[.]" Dakota Constructors reads these to mean that taking material from stockpiles is the same as taking exposed material directly from the ground.

property was never reclaimed, the property never ceased to meet the definition of a quarry in the Ordinance.[5]

[¶15.] The Board argues that its interpretation of the term "extraction," which is not otherwise defined in the Ordinance or in state law, is entitled to deference under SDCL 11-2-61.1. The Board contends that there is no basis for reversal because Dakota Constructors' arguments address the Board's interpretation of the Ordinance it administers, and its interpretation is a proper and permissible reading. The Board insists that the use in article 5, section 507 of the Ordinance is not simply existence as a quarry but, rather, "[e]xtraction of sand, gravel, or minerals. . . ." The Board maintains that its interpretation is reasonable and consistent with the purpose of the Ordinance. *Holborn*, 2021 S.D. 6, ¶ 49, 955 N.W.2d at 381 (holding a board's interpretation was not erroneous when it was consistent with ordinance provisions and purpose). The Board contends that Dakota Constructors' proposed interpretation of surface mining and overburden as referenced in SDCL 45-6B-3(15) and SDCL 45-6B-3(13) is strained, contrary to the Board's interpretation, and not controlling of the narrow issue. Further, the Board asserts that state licensing requirements for mining are distinct from land uses in county zoning and irrelevant to the questions under consideration.

---

5. The Ordinance defines a "quarry" as "[a] place where consolidated rock has been or is being removed by means of an open excavation to supply material for construction, industrial or manufacturing purposes, but does not include a wayside quarry or open pit metal mine." However, the term "quarry" does not appear in the list of conditional uses defined in article 5, section 507, or anywhere else in the Ordinance. Therefore, this definition does not bear on the Board's reading of the term "extraction" as used in section 507.

### *1.* *Interpretation of the Ordinance*

[¶16.] The Ordinance is consistent with state law in limiting "any subsequent use" of property that has "discontinued for a period of more than one year[.]" SDCL 11-2-26 provides:

> Any lawful use, lot, or occupancy of land or premises existing at the time of the adoption of the zoning ordinance may be continued, even though the use, lot, or occupation does not conform to the provisions of the ordinance. However, if the nonconforming use, lot, or occupancy is discontinued for a period of more than one year, any subsequent use, lot, or occupancy of the land or premises shall conform with the zoning ordinance.

[¶17.] Article 13, section 1305 of the Ordinance specifies the conditions under which preexisting nonconforming uses may continue in Hanson County:

> Where at the time of passage of this revised ordinance lawful use of land exists, which would not be permitted by the regulations imposed by this ordinance, and where such use involves no individual structure with a replacement cost exceeding one thousand (1,000) dollars, the use may be continued so long as it remains otherwise lawful, provided:
> . . .
> 3. If any nonconforming use of land ceases, for any reason, for a period of more than one (1) year, any subsequent use of such land shall conform to the regulations specified by this ordinance for the district in which such land is located[.]

The Ordinance defines the terms "nonconforming use" and "use" as follows:

> Nonconforming Use - A land use or building or structure or portion thereof lawfully existing at the effective date of this ordinance, or at the time of any amendment thereto, which does not conform to the regulations of the zone in which it is located.

> Use - Use shall mean the purpose for which a lot or a building or structure, or any portion thereof, is designed, arranged, intended, occupies or maintained, and "used" shall have a corresponding meaning.

[¶18.] There is no dispute that the property is in a district that is currently zoned agricultural. Article 5, section 501 of the Ordinance explains that "[t]he

intent of Agricultural District (AG) is to protect agricultural lands and lands consisting of natural growth from incompatible land uses in order to preserve land best suited to agricultural uses and land in which the natural environment should be continued and to limit residential, commercial, and industrial development to those areas where they are best suited for reasons of practicality and service delivery." The extraction of sand, gravel, or minerals is not a permitted principal use within an agricultural district under the Ordinance. Thus, if extraction at the site had ceased for more than one year, it was not a continuing prior nonconforming use. However, article 5, section 507 of the Ordinance authorizes the Board to grant a CUP for this use of the property.

[¶19.] In determining that the extraction of sand, gravel, and rock was not a continuing prior nonconforming use, the Board differentiated between the extraction of material from the ground and the removal of previously extracted and stockpiled material from the site. The Board determined that the removal of previously extracted material does not fall within the term "extraction" under the Ordinance and found that the extraction of sand, gravel, or minerals from their natural state had not occurred for more than a year.

[¶20.] Extraction is not defined elsewhere in the Ordinance or under state law. Dakota Constructors' assertion that the Board was interpreting state law rather than its own Ordinance is incorrect. The Ordinance allows CUPs for the "[e]xtraction of sand, gravel, or minerals provided such uses meet requirements for conducting surface mining activities of SDCL [chapter] 45-6B." The reference to SDCL chapter 45-6B under the Ordinance simply requires an operator to be

licensed under state law; it does not require the Board to construe state statutes to define the use identified in the Ordinance. By its plain language, the Ordinance merely imposes a condition of compliance with state law requirements on those uses previously identified as subject to regulation by that provision of the Ordinance, i.e., "[e]xtraction of sand, gravel, or minerals."

[¶21.] Dakota Constructors also cites cases from other jurisdictions that support a broader construction of the nonconforming use than applied by the Board.[6] These cases are not persuasive to our consideration under our limited certiorari review. While the cases suggest that the Board could have read the term extraction more broadly, we see nothing in the Board's reading of its Ordinance that was wrong or erroneous. Dakota Constructors has failed to show that the Board's

---

6.     Dakota Constructors expounds upon cases from Wyoming, New Mexico, and Iowa in detail. *See River Springs Ltd. Liability Co. v. Bd. of Cnty. Comm'rs of Cnty. of Teton*, 899 P.2d 1329 (Wyo. 1995) (rejecting, without any apparent deference, the county's conclusion that a substantially dormant mine was a cessation of use when it was not reclaimed and there was no intention to abandon it); *Romero v. Rio Arriba Cnty. Comm'rs*, 149 P.3d 945 (N.M. Ct. App. 2006) (applying substantial evidence review and determining that the landowner did not have to be extracting new material from the ground to continue the nonconforming use); *Ernst v. Johnson Cnty.*, 522 N.W.2d 599 (Iowa 1994) (giving "some" deference to interpretation of the ordinance but determining final construction was a question of law for the court to decide and holding that due to the nature of the business, maintenance of required permits and licenses in combination with minimal activity demonstrated an uninterrupted operation following the initial establishment of a nonconforming use). Dakota Constructors also briefly surveys cases from other jurisdictions in support of its contention that diminished use is not abandonment. *See, e.g.*, *FLM Enters., LLC v. Peoria Cnty. Zoning Bd. of Appeals*, 148 N.E.3d 164 (Ill. App. Ct. 2020); *South Cnty. Sand & Gravel Co. v. Town of Charlestown*, 446 A.2d 1045 (R.I. 1982); *Polk Cnty. v. Martin*, 636 P.2d 952 (Or. 1981); *Union Quarries, Inc. v. Bd. of Cnty. Comm'rs of Johnson Cnty.*, 478 P.2d 181 (Kan. 1970); *Hinkle v. Bd. of Zoning Adjustment & Appeals of Shelby Cnty.*, 415 S.W.2d 97 (Ky. 1967).

reading of extraction was contrary to the Ordinance, contrary to state statute, or otherwise wrong or erroneous.

### 2. Factual findings

[¶22.] After considering the information presented by Dakota Constructors, the Board found that "[t]he previous operation has ceased for more than one year according to all records filed with the State of South Dakota." Although Dakota Constructors presented evidence that aggregate continued to be hauled from existing stockpiles in the quarry, there is no evidence contradicting the reports filed by Fisher that zero tons of gravel were removed from their natural state on the site from 2004 to 2021. Dakota Constructors claims, however, that Fisher's continued removal of stockpiled aggregate, without the Board requiring a CUP, meant there was no cessation of the prior nonconforming use. However, the opposite conclusion follows just as easily—Fisher's nonconforming mining activities had ceased, and the Board did not consider merely removing stockpiled aggregate to be extraction. Finally, Fisher's maintenance of an active statewide mining license did not establish continuing prior nonconforming use at the Hanson County property; it merely provided Fisher with authority from the State to conduct mining activities if it chose to do so.

[¶23.] There is no claim that the Board acted fraudulently or arbitrarily, or that its findings were in willful disregard of the indisputable proof. *See Powers*, 2022 S.D. 77, ¶ 27, 983 N.W.2d at 604. Rather, the Board considered the information submitted in support of the CUP application and in support of the argument that a CUP was unnecessary. In fact, it continued its consideration

across multiple Board meetings to ensure it had all the information it needed to reach its decision.

[¶24.]    Therefore, the circuit court properly denied Dakota Constructors' petition for writ of certiorari.

[¶25.]    Affirmed.

[¶26.]    KERN, SALTER, DEVANEY, and MYREN, Justices, concur.